UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JOHN KEENAN, through his guardian KATHLEEN COX,<br><br>Plaintiffs,<br><br>vs.<br><br>TOYS "R" US, INC.,<br><br>Defendant. | Case No. 2:05-cv- 00615-APG-VCF<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The non-jury trial of this matter took place on January 13, 14, 17, 21, and 24, 2014. The Court has reviewed the admitted exhibits and considered the trial and submitted deposition testimony of the witnesses. Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. Plaintiff Kathleen Cox is the sister of Plaintiff John Keenan

2. Defendant Toys "R" Us, Inc. ("TRU") is a toy and juvenile products retailer.

3. TRU employed Mr. Keenan from approximately August 8, 1992 until June 14, 2001 as an at-will employee.

4. Mr. Keenan, was born in 1950 with birth defects, and then suffered a serious head injury in a childhood accident. Everyone in his family recognized he was mentally challenged.

5. Mr. Keenan has been gainfully employed since he was eighteen years old.

6. Mr. Keenan lived with his mother all of his adult life. In 1992, they moved to Las Vegas, into a home shared with his sister (Ms. Cox) and her family. Mr. Keenan's and Ms. Cox's mother died in 1995.

7. Ms. Cox has been and continues to take care of Mr. Keenan, providing him a home, transportation, and handling his personal and financial affairs.

LITTLER MENDELSON
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

8.  In August 1992, Ms. Cox looked for a job for her brother close to their home. She inquired at the Meadows Lane TRU store, filled out a job application for Mr. Keenan, and spoke with a manager or assistant manager (named Travis) about her brother's capabilities and limitations. She mentioned his lack of education, but that he had been employed as a maintenance person for over 20 years at Sage Allen, a department store in Connecticut. On the application she disclosed that Mr. Keenan had attended a "special school."

9.  Ms. Cox testified she told Travis that Mr. Keenan could perform only maintenance-type duties. Ms. Cox testified that Travis spoke with Mr. Keenan about his being a custodian and hired him immediately.

10. The retail toy industry is very competitive, and TRU distinguishes itself from its competitors by emphasizing superior customer service. Every visit by every customer is designed to be an exceptional experience, and TRU's employees are critical to that positive customer experience.

11. Mr. Keenan knew of and understood TRU's high customer-service expectations and requirements.

12. Mr. Keenan's job description listed customer service as an essential job function.

13. Mr. Keenan's annual reviews had a specific category for "customer service."

14. Mr. Keenan can recognize simple words and symbols, write his own name and numbers, copy printed words, and identify letters. Mr. Keenan cannot drive a car or handle his own finances, and appears to be unable to live on his own.

15. Some of Mr. Keenan's mental challenges are apparent to a reasonable, adult-aged person observing and speaking with him for more than a few minutes. However, it is not apparent that he can read and write only a little unless he is observed trying to perform those tasks.

16. Many of Mr. Keenan's TRU co-workers recognized that there was something different about Mr. Keenan, that he was a little "slow," that he might not be able to read, and that he rode a bicycle to work. He was never asked to perform functions like cashiering or answering the phones. Other non-disabled TRU workers likewise did not perform some of those functions.

17. Over time, Mr. Keenan's job duties at TRU evolved. He helped with unloading trucks, stocking shelves, wrangling shopping carts in the parking lot, renovating stores, and dressing up as the TRU mascot Geoffrey the Giraffe.

18. Mr. Keenan enjoyed dressing up and playing Geoffrey the Giraffe. In that role, he interacted with children and adults, but was not permitted to speak. That same restriction applied to all employees who played Geoffrey, so that the only Geoffrey voice children would know would be the voice heard on TRU commercials.

19. All of the positions at TRU require some customer interaction, and Mr. Keenan had regular interaction with TRU's customers for several years.

20. Over the years, Mr. Keenan received recognition and awards from TRU and from customers based on his positive customer service.

21. Numerous witnesses testified that Mr. Keenan regularly interacted with customers during the duration of his employment at TRU.

22. Mr. Keenan enjoyed helping customers at TRU, and when they asked him something he did not know, he would find another employee to help the customer.

23. Former customer and employee Kevin Cooney testified via his deposition that Mr. Keenan was very helpful finding merchandise (a "go-to guy"), and had great knowledge of certain items sold at TRU.

24. By all accounts, Mr. Keenan was a good and hard worker when properly instructed; he worked well with customers (within limits); he worked extra hours and off hours when needed (e.g., during store renovations); and he was well-liked by most of the other employees.

25. However, on March 18, 2001 and April 14, 2001, TRU counseled Mr. Keenan for inappropriate communications with guests. The March 18, 2001 counseling review form states that TRU would not tolerate future episodes of poor behavior towards guests. In addition, Ms. Cox was aware of prior instances of counseling for Mr. Keenan's customer service violations in April 1995, September 1995, and May 1998.

26. On June 13, 2001, customer Ashley Einig visited the TRU store on Meadows Lane in Las Vegas, Nevada. Ms. Einig was accompanied by her then-boyfriend James Calvert. The young adults went to the baby section to buy a gift.

27. While shopping, Ms. Einig placed a paper soda cup on a box on the shelf so that she could pick up some toys for a closer look. When Ms. Einig proceeded down the aisle, she forgot that she had left the paper cup behind.

28. Mr. Keenan approached Ms. Einig, rudely yelled at her as if she was a child, and ordered her to pick up the paper cup and throw it in the trash.

29. Mr. Keenan yelled at Ms. Einig so loudly that Elizabeth Pelikan, a TRU associate, could hear him as she assisted another customer on the opposite side of the aisle. Concerned about the source of the commotion, Ms. Pelikan walked to the other side of the aisle and observed Mr. Keenan yelling at Ms. Einig.

30. Ms. Einig was shocked by Mr. Keenan's inappropriate treatment of her. His yelling, unprofessional tone of voice and body movement made her uncomfortable.

31. Ms. Einig was particularly taken aback by Mr. Keenan's behavior in part because she worked as a customer service representative at Friendly Ford. She expressed that the car dealership would never tolerate an employee yelling at or arguing with its customers.

32. Mr. Keenan followed Ms. Einig back to the aisle to pick up the cup and continued to follow her to the trash can where she threw the cup away.

33. Ms. Einig and Mr. Calvert immediately stopped shopping and walked to the front of the store, where Ms. Einig complained to a manager about Mr. Keenan's inappropriate conduct.

34. The Store Manager, Jeff Brooks, asked Ms. Einig to write a voluntary statement documenting Mr. Keenan's behavior. Ms. Einig handwrote a statement documenting the incident, then left the store without purchasing any items.

35. During her deposition, Ms. Einig described the way she was treated as "rude," "harsh," "shocking," "aggressive," and "unprofessional."

36. Mr. Brooks also spoke to Ms. Pelikan, who explained that she heard Mr. Keenan yelling at Ms. Einig for leaving the cup on the shelf. Mr. Brooks asked Ms. Pelikan to document her observations which she did in her written statement.

37. After Ms. Einig left the store, Mr. Brooks called Mr. Keenan in to a meeting to discuss the incident. Mr. Keenan admitted confronting Ms. Einig about leaving a cup on a shelf. Mr. Brooks told Mr. Keenan that TRU could not tolerate such inappropriate behavior from its associates. Mr. Keenan was remorseful and understood that he had done something wrong.

38. At the conclusion of the meeting, Mr. Brooks informed Mr. Keenan that Mr. Brooks was required to contact the TRU HR representative (Joy Stich, who was located in Rialto, California) to obtain guidance as to the appropriate disciplinary action. As a Store Manager, Mr. Brooks did not have the authority to terminate Mr. Keenan's employment.

39. Mr. Brooks did not suspend or fire Mr. Keenan. However, Mr. Keenan believed he had been fired. He left the meeting, immediately turned in his TRU employee's vest, and left the store without clocking out or speaking to anyone.

40. After his meeting with Mr. Keenan, Mr. Brooks called Ms. Stich and left her a message because she was unavailable.

41. That evening, Ms. Cox found Mr. Keenan sobbing in his bedroom, and learned that TRU had apparently fired him.

42. Either later that evening or the next day, Ms. Cox went to the TRU store to discuss the incident and to ask Mr. Brooks to give Mr. Keenan his job back.

43. Mr. Brooks confirmed that Mr. Keenan had yelled at a customer who had simply left a paper cup on the shelf. Ms. Cox offered to have Mr. Keenan see a doctor and to seek ways for him to address the problem. Mr. Brooks informed Ms. Cox that he did not have the authority to make decisions about termination of employment, and thus he would have to wait for direction from Ms. Stich.

44. Ms. Stich subsequently spoke to Mr. Brooks, who informed her of the situation. Ms. Stich expressed that Mr. Keenan's altercation with the TRU guest was inappropriate, unacceptable, and could not be tolerated by any employee.

5.

1    45.    Ms. Stich decided that TRU would not re-employ Mr. Keenan.

2    46.    By a letter dated June 19, 2001, Ms. Cox, acting as the informal representative of her brother, asked the TRU Store Manager for a copy of her brother's personnel file.

47.    On June 28, 2001, in a phone conference with Ms. Cox in response to her June 19, 2001 letter, Mr. Brooks told Ms. Cox to call the TRU legal department and gave her the phone number.

48.    On July 7, 2001, Ms. Cox sent TRU Executive Vice President of Human Resources Michael D'Ambrose a letter stating that her brother had been wrongfully terminated, and that Mr. Brooks should have made an ADA accommodation by "explain[ing] to the customer that [Mr. Keenan] sees the store as his 'personal responsibility,' and he could have explained to [Mr. Keenan] that, although the customer should not have left a cup in the aisle, it wasn't right to scold her." Ms. Cox did not want her brother re-hired at the Meadows Lane TRU store because of the lingering bad feelings about the incident, but instead requested compensation for the way he was treated.

49.    There is no evidence that the TRU decision-maker (Ms. Stich) had any animus toward Mr. Keenan because he was disabled or perceived as such. Ms. Stich testified via her deposition that she did not know that Mr. Keenan was disabled.

50.    No evidence was presented that able-bodied employees at TRU mistreated customers without discipline.

51.    Mr. Keenan's employment at TRU was not terminated for an inability to drive, read, or write. Rather, his termination was due to poor treatment of a customer. As such, to the extent Mr. Keenan was disabled due to an inability to drive, read, or write, it is irrelevant to the outcome of this case.

52.    Mr. Keenan did not suffer from a disability that entirely prevented him from interacting with customers. To the contrary, over the years he often interacted with customers on a limited basis and received commendations for such work.

53.    Mr. Keenan understood that sales associates were "to be nice to customers."

54.    Several witnesses testified (live or via deposition) that TRU is a service business, customer service is very important, it is never proper for a store employee to be rude to a guest or

6.

1  customer, and that violations of TRU policy that threaten TRU's relationship with its guests are taken very seriously and may be cause for immediate termination.

55. TRU was so serious about customer service that it instituted a "Disney" style training program to help its employees create a magical, Disneyland-like experience for every TRU customer.

56. Being rude to a customer is a direct violation of TRU policy and clear grounds for termination without the need for progressive discipline, even for a first offense.

57. Although unclear, it is irrelevant whether Mr. Keenan was fired or mistakenly walked off the job. Even if he had not resigned, his employment would have been terminated for his mistreatment of Ms. Einig. TRU chose not to rehire Mr. Keenan because of his misconduct in being rude to a customer.

58. When TRU hired Mr. Keenan in 1992, and at various times during the course of his employment with TRU, Ms. Cox requested various accommodations for him. TRU honored all of those requests during the duration of his employment.

59. TRU made the accommodations requested by Ms. Cox without requiring her to fill out any forms. Thus, completing a form was not a prerequisite to a reasonable accommodation.

60. TRU presented no evidence that any of the accommodations or workplace adjustments previously accorded Mr. Keenan before 2001 presented any hardship, much less an undue hardship.

61. The former Store Director for the Meadows Lane TRU (Bruce Weber) testified via deposition that he knew that Mr. Keenan needed more supervision because "he was a little slow," but that he treated Mr. Keenan like he treated all of the other employees, and this did not present an undue hardship. Mr. Weber testified that if he had known Mr. Keenan could not read or write, he would have accommodated him, and this would not have been an undue hardship.

62. Prior to Mr. Keenan's mistreatment of customer Ashley Einig, Ms. Cox never spoke to Store Manager Jeff Brooks about her brother or anything else. Plaintiffs never made a complaint about Mr. Brooks' treatment of Mr. Keenan before Mr. Keenan was counseled about his mistreatment of Ms. Einig.

63. Nobody ever asked TRU to prevent Mr. Keenan from interacting with customers, nor did Plaintiffs want Mr. Keenan's contact with customers limited or eliminated.

64. There is no evidence in (1) Dr. Frank Paul's report, (2) Dr. Carmena's note, (3) Plaintiffs' own testimony, (4) any witness's testimony, nor (5) Mr. Keenan's employment history that Mr. Keenan was inherently unable to interact with customers due to a disability.

65. Ms. Cox testified that the reasonable accommodation that should have occurred in this case would have been for Mr. Brooks to explain to the customer (Ms. Einig) that Mr. Keenan has special needs and did not mean to offend her.

66. Ms. Cox admits that Mr. Keenan should have been disciplined for his mistreatment of Ms. Einig, but she disagrees with the level of discipline given.

67. According to TRU policy, the incident involving Ms. Einig was a sufficient basis for TRU to terminate and/or not rehire Mr. Keenan.

68. Ms. Cox secured replacement employment for Mr. Keenan: first at Commercial Hardware from January 2002 through 2008, and then at Smith's Food King from 2009 to present.

69. After investigating Mr. Keenan's charge of discrimination against TRU, the Nevada Equal Rights Commission ("NERC") concluded that the "evidence did not meet the legal criteria for establishing that discriminatory acts occurred." The U.S. Equal Employment Opportunity Commission subsequently "adopted the findings" of the NERC.

## CONCLUSIONS OF LAW

1. TRU is an employer that is required to fully comply with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Nevada state statutes prohibiting discrimination on the basis of disability.

2. TRU admitted in its March 12, 2002 letter to the NERC that some of its managers and associates knew that Mr. Keenan was "slow." Moreover, "because he was perceived to be slightly mentally challenged, managers would routinely clarify his understanding of documents he was signing by verbally reiterating what the documents stated."

3.      Plaintiffs have the burden of proof in this case to prove by a preponderance of the evidence that TRU unlawfully discriminated against Mr. Keenan on the basis of his disability. As a matter of law, Plaintiffs failed to meet their burden.

4.      Mr. Keenan's employment was not terminated because he was disabled or perceived as such.

5.      An employer is not required to "withhold discipline or termination of an employee who, because of a disability, violated a conduct rule that is job-related for the position in question and consistent with business necessity." *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, p. 20, question #34 (emphasis omitted).

6.      "An employer never has to tolerate or excuse violence, threats of violence, stealing, or destruction of property. An employer may discipline an employee with a disability for engaging in such misconduct if it would impose the same discipline on an employee without a disability." *Id.*

7.      "An employer must make reasonable accommodation to enable **an otherwise qualified employee with a disability** to meet . . . a conduct standard **in the future**, barring undue hardship, except where the punishment for the violation is termination. Since reasonable accommodation is always **prospective**, an employer is not required to excuse past misconduct even if it is the result of the individual's disability." *Id.* (question #35, emphasis in original).

8.      "Almost all of the circuits to rule on the question have held that an employer has a mandatory obligation to engage in the interactive process and that this obligation is triggered either by the employee's request for accommodation or by the employer's recognition of the need for accommodation." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) *vacated sub nom. U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

9.      An employer's lack of investigation into the reasonable accommodation and failure to engage in the interactive process is not actionable where the plaintiff cannot show the availability of a reasonable accommodation under the ADA. *Broussard v. Univ. of Cal.*, 192 F.3d 1252, 1259 (9th Cir. 1999) (citing *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997).

10. Ms. Cox's recommended accommodation (i.e., explain Mr. Keenan's mental challenges to the customer) is not reasonable because the harm to the employer (a very upset customer) has already occurred, many customers do not complain about mistreatment (and therefore the employer can lose customers without knowing of the problem), and it violates Mr. Keenan's rights by causing co-workers to explain to customers that he is a "special-needs" employee.

11. "Recognizing interacting with others as a major life activity of course does not mean that any cantankerous person will be deemed substantially limited in a major life activity. Mere trouble getting along with coworkers is not sufficient to show a substantial limitation. . . . In addition, the limitation must be severe or, in other words, substantial when compared to the ability of 'the average person in the general population.'. . . [A] plaintiff must show that his 'relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.'" *McAlindin v. Cnty. of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999) (citations omitted) *opinion amended on denial of reh'g*, 201 F.3d 1211 (9th Cir. 2000), *cert. denied*, 530 U.S. 1243 (2000).

12. Mr. Keenan did not have severe problems on a regular basis when interacting with customers. To the contrary, his negative interactions were few, and he received several commendations for positive interactions with customers.

13. Assuming, *arguendo*, that Mr. Keenan had a disability that precluded him from interacting with customers, such a limitation could not be reasonably accommodated as a matter of law without causing an undue hardship. Moreover, no positions existed at TRU that did not involve customer interaction. In addition, Plaintiffs did not want Mr. Keenan permanently barred from interacting with customers.

14. There was nothing "complex" about the interaction between Mr. Keenan and Ms. Einig.

15. Plaintiffs have not rebutted TRU's legitimate nondiscriminatory business reason for its employment decisions toward Mr. Keenan (based on his mistreatment of Ms. Einig), and have not met their burden of establishing pretext.

16. Federal statutes proscribing employment discrimination, such as the ADA, were not intended as a vehicle for the general judicial review of business decisions. *See Douglas v. Anderson*, 656 F.2d 528, 534 (9th Cir. 1981).

17. This Court does not sit as a super personnel department to re-examine an entity's business decisions. *See e.g., Sharpe v. American Tel. & Tel. Co.*, 66 F.3d 1045, 1050 (9th Cir. 1995) (the Ninth Circuit has long held that discrimination laws do not give courts authority to second guess business decisions); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (it does not matter for purposes of discrimination if the proffered justification for an employment action was "foolish or trivial or even baseless"); *see also Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986); and *Green v. Maricopa County Cmty. College Sch. Dist.*, 265 F. Supp. 2d 1110, 1128 (D. Ariz. 2003) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. We do not sit as a super personnel department that reexamines an entity's business decision and reviews the propriety of that decision.") (citations omitted).

18. It is unfortunate that TRU terminated (or refused to rehire) Mr. Keenan, who by all accounts was a good worker who loved TRU and his job there. However, TRU did not act illegally when it decided that it would no longer employ him.

19. Based on the foregoing, Judgment shall be entered in favor of defendant TOYS "R" US, INC. on all of the Plaintiffs' claims.

DATED this 21st day of February, 2014.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

11.